**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| DIMPLE PATEL, Derivatively On Behalf Of INDIA GLOBALIZATION CAPITAL, INC., 6455 N. Sauganash Avenue Lincolnwood, IL 60712-4205 | |
| Plaintiff, | |
| v. | |
| RAM MUKUNDA 4336 Montgomery Avenue Bethesda, Maryland 20814 | |
| and | Civil Action No.: _____ |
| CLAUDIA GRIMALDI 4336 Montgomery Avenue Bethesda, Maryland 20814 | |
| and | |
| ROHIT GOEL 4336 Montgomery Avenue Bethesda, Maryland 20814 | |
| and | |
| RICHARD PRINS 4336 Montgomery Avenue Bethesda, Maryland 20814 | |
| And | |
| SHAJY MATHILAKATHU 4336 Montgomery Avenue Bethesda, Maryland 20814 | |
| and | |
| SUDHAKAR SHENOY 4336 Montgomery Avenue Bethesda, Maryland 20814 | |
| Defendants, | |

-and-

INDIA GLOBALIZATION CAPITAL, INC.
4336 Montgomery Avenue
Bethesda, Maryland 20814

                    Nominal Defendant.

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Dimple Patel ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant India Globalization Capital, Inc. ("IGC," "India Globalization," or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint") for breaches of fiduciary duty committed by the Individual Defendants (defined herein).  Plaintiff bases her allegations on personal knowledge as to her own acts, and on information and belief as to all other allegations, based upon investigation by counsel, including, but not limited to, a review and analysis of:  (i) regulatory filings made by IGC with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by IGC; (iii) a consolidated securities class action lawsuit filed in the United Stated District Court for the District of Maryland against IGC and defendants Ram Mukunda ("Mukunda") and Claudia Grimaldi ("Grimaldi") captioned, *Tchatchou v. India Globalization Capital Inc.*, 8:18 Civ. 3396-PWG (the "Securities Class Action"), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; and (iv) other publicly available information, including media and analyst reports concerning IGC.

## NATURE OF THE ACTION

1.     This is a shareholder derivative complaint brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual

Defendants' breaches of fiduciary duty that have occurred from October 25, 2017 through the present (the "Relevant Period") and have caused substantial harm to the Company.

2.      India Globalization was founded in 2005 and initially claimed to focus on managing real estate in Malaysia, trading commodities such as steel and iron ore, and leasing heavy construction equipment.  After a sudden pivot in 2013, India Globalization now purports to operate a second business segment focused on the development and commercialization of cannabinoid-based alternative therapies for Alzheimer's disease, Parkinson's disease, and general pain.

3.      In connection with the shift in its business plan, IGC filed a patent application for a cannabinoid-based supplement called Hyalolex, which, according to the Company, can be used to treat certain symptoms of Alzheimer's disease.  However, based on the information contained in the Company's filings with the SEC, IGC only devoted approximately $150,000 a year to research and development.  There is no evidence that the Company has attempted to initiate clinical studies or taken any of the other steps necessary to receive approval from the U.S. Food and Drug Administration ("FDA") to market its products.

4.      Throughout the Relevant Period, the Company emphasized its competitive advantage in the medical cannabis industry, which it claimed was bolstered by its in-depth knowledge of the cannabis industry and the substantial experience of Mukunda.  In an effort to capitalize on the marijuana stock trend, on October 25, 2017, IGC issued a press release in which it announced that it had "entered into a Memorandum of Understanding with Medicann Handels GmbH ("Medicann"), a company based in Hamburg, Germany, for the import and distribution of IGC's cannabinoid based therapies including IGC-AD1 (Hyalolex) to pharmacies in Germany."  IGC's purported presence in the cannabis market was belied by its own financial statements – in

2017, the Company had approximately $2.2 million in sales, none of which came from its cannabis therapy business.

5.      On December 26, 2017, the Company issued a press release titled "India Globalization Capital to use Blockchain to Address Issues Specific to the Medical Cannabis Industry." According to the press release, the Company planned to "leverage its existing team of technology and healthcare experts to develop methods utilizing blockchain in areas such as product identification assurance." IGC's announcement was a strategic move intended to tap into the blockchain craze – prices of cryptocurrencies, including Bitcoin were near an all-time high. The announcement, completely devoid of evidence of Company involvement with or investment in blockchain technology, sent IGC's stock soaring.

6.      The Company also unabashedly continued to take advantage of the cannabis-stock craze throughout 2018. On January 2, 2018, Mukunda was quoted in a press release stating that the Company was "preparing the groundwork necessary to get Hyalolex . . . ready for Phase 2-B human trials" and that the Company was "ready for an exciting 2018." Then, on September 25, 2018, the Company issued a press release announcing India Globalization's entry into the "CBD-Infused Energy Drink Space." In response to the announcement, the price of India Globalization's stock increased exponentially from $2.33 on September 25, 2018, to an incredible $13.00 per share on October 2, 2018. Almost all of the Individual Defendants stood to benefit most from the exponential rise in IGC's stock price as combined they own a significant amount of outstanding Company shares.

7.      Then, on October 28, 2018, an article was re-published on the website *MarketWatch*, entitled "All the potential red flags for investors in IGC, the pot stock that jumped

1,000% in three months."  The article described, in great detail, a significant number of red flags about the Company and its business operations.

8.      Among many other red flags, the article revealed that India Globalization claimed that its new CBD energy drink, Nitro G, would be manufactured in partnership with a company based in Malaysia.  In September 2018, IGC had announced that it would produce a Nitro G in connection with and had entered into a distribution agreement with a Malaysia-based manufacturing partner.  Unbeknownst to investors, what IGC touted as its "experience[d]" "manufacturer" in Malaysia was a recently-created distributor entity – not a manufacturer – over which the Individual Defendants were able to exercise substantial control through a key insider appointment.  Even more deceptively, the Individual Defendants failed to disclose to investors that marijuana, or any other form of cannabis product, including CBD oil, is illegal in Malaysia.  In fact, the manufacture and possession of such items is punishable by death.

9.      Other news sources also pointed out additional warning signs related to IGC.  For example, IGC's "headquarters" were located on a residential block in a small building that was previously used as a daycare center.  Both *MarketWatch* and the *Financial Times* published photos of the property, which appears to still have playground equipment in the front yard.

10.      The day after the *MarketWatch* article was re-published, on October 29, 2018, the New York Stock Exchange ("NYSE") announced that it had begun proceedings to delist the common stock of India Globalization from the NYSE.  According to the press release issued in connection with the announcement, "the Company or its management have engaged in operations which, in the opinion of the Exchange, are contrary to the public interest."  The press release also disclosed that India Globalization had "discontinued the business that it conducted at the time it was listed or admitted to trading, and has become engaged in ventures or promotions which have

not developed to a commercial stage or the success of which is problematical."  Soon after, trading of the Company's common stock was halted.  The Company's stock was only recently relisted and available for public trading.

11.     The Individual Defendants have repeatedly made materially false and/or misleading statements, and have failed to disclose material adverse facts about the Company's business, operations, and prospects in an effort to artificially inflate the value of IGC stock, as described herein.

12.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, IGC has sustained damages as described below.

## JURSIDICTION AND VENUE

13.     This Court has subject matter jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

14.     This Court has personal jurisdiction over the defendants because either they live in the State of Maryland or they committed or omitted acts in the State of Maryland for which they are being sued in this action.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of in this action occurred in this District and because defendants conducted business here and engaged in activities that had an effect in this District.

## PARTIES

16.     Plaintiff is a current shareholder of IGC common stock.  Plaintiff has continuously held IGC common stock at all relevant times.  Plaintiff is a citizen of Illinois.

17.     Nominal Defendant IGC is a Maryland corporation with its principal executive offices at 4336 Montgomery Ave., Bethesda, Maryland 20814.  According to its SEC filings, the Company's main focus is to develop and commercialize cannabinoid based alternative therapies for indications such as Alzheimer's disease, Parkinson's disease, and pain.  Its lead product is Hyalolex, an alternative oral therapy for the treatment of symptoms associated with Alzheimer's disease.  The Company has filed several patents for its pipeline of products including ones for the treatment of Parkinson's Central Nervous System related disorders, eating disorders, and seizures in cats and dogs.  Since its inception, the Company operates a legacy business that involves trading commodities and heavy equipment rental.

18.     Defendant Mukunda has served as IGC's Executive Chairman, Chief Executive Officer ("CEO"), and President since the Company's inception on April 29, 2005.  Mukunda beneficially owns 3,018,683 shares of the Company's common stock, or 9.1% of outstanding shares.  For the fiscal year ended March 31, 2018, Defendant Mukunda received $468,723 in compensation from the Company, which included $300,000 in salary, $148,198 in stock awards, and $20,525 in all other compensation.  Upon information and belief, Mukunda is a citizen of Maryland.

19.     Defendant Grimaldi served as General Manager through May 9, 2018 when she was promoted to Vice President and Principal Financial Officer.  Grimaldi beneficially owns 644,007 shares of the Company's common stock, or 1.9% of outstanding shares.  For the fiscal year ended March 31, 2018, Defendant Grimaldi received $212,000 in compensation from the Company, which included $120,000 in salary and $92,000 in stock awards.  Upon information and belief, Grimaldi is a citizen of Maryland.

20.     Defendant Rohit Goel ("Goel") has been the Company's Principal Accounting Officer ("PAO") since September 2017.  Goel beneficially owns 100,000 shares of the Company's common stock, or 0.3% of outstanding shares.  For the fiscal year ended March 31, 2018, Defendant Goel received $41,000 in compensation from the Company in the form of stock awards. Upon information and belief, Goel is a citizen of India.

21.     Defendant Richard Prins ("Prins") Prins has served as the Company's Chairman and Audit Committee Chairman since 2012, and has served as a director since May 2007.  Prins beneficially owns 418,000 shares of the Company's common stock, or 1.3% of outstanding shares. For the fiscal year ended March 31, 2018, Defendant Prins received 150,000 shares of Company common stock in compensation from the Company, in the form of stock awards.  Upon information and belief, Prins is a citizen of Virginia.

22.     Defendant Sudhakar Shenoy ("Shenoy") has served as the Company's Compensation Committee Chairman since 2012, and has served as a Director since the inception of IGC in May 2005.  Shenoy beneficially owns 980,000 shares of the Company's common stock, or 3.0% of outstanding shares.  For the fiscal year ended March 31, 2018, Defendant Shenoy received 150,000 shares of IGC common stock in compensation from the Company in the form of stock awards.  Upon information and belief, Shenoy is a citizen of Virginia.

23.     Defendant Shajy Mathilakathu ("Mathilakathu") has served as the Company's Co-PAO at all times relevant hereto.  Since 2011, Mathilakathu has served as the Assistant General Manager of Accounting.  Upon information and belief, Mathilakathu is a citizen of India.

24.     Defendants Mukunda, Grimaldi, Goel, Prins, Mathilakathu, and Shenoy are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

27.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of IGC were required to, among other things:

> a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;
>
> b.      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      c.     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

      d.     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

      e.     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

28.     Each of the Individual Defendants, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

29.     The Company has established a Code of Ethics (the "Code") for the following purpose:

The purpose of this Code of Ethics is to deter wrongdoing and to promote:

(1)     Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

(2)     Full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by IGC and in both IGC's public and internal communications;

(3)     Compliance with applicable governmental laws and regulations;

(4)     The prompt internal reporting of violations of this Code of Ethics to an appropriate person or persons identified in this Code of Ethics; and

(5)     Accountability for adherence to this Code of Ethics.

This Code of Ethics must be applied by all directors, officers and other employees in good faith and with reasonable business judgment to enable IGC to achieve its operating and financial goals within the framework of the law and ethical practices.

30.     The Code states:

Ethical Standards of Conduct

The directors, officers and employees must follow the accounting rules and controls set forth by the SEC and the Financial Accounting Standards Board.  The directors, officers and other employees must also comply with the obligations set forth in the Sarbanes-Oxley Act of 2002.

Each director, officer and other employee shall, when required, provide full, fair, accurate, timely, and understandable disclosure in the periodic reports that IGC is required to file.  Accordingly, all account books, budgets, project evaluations, expense accounts and other documents utilized in IGC's business must accurately report the matters to which they relate.

All of IGC's assets and liabilities must be carefully and properly set forth in IGC's financial records.  IGC's independent auditors must be given full access to all information necessary for them to properly conduct any audit of IGC or any of its subsidiaries or divisions.  No director, officer or other employee shall conceal a mistake in IGC's financial reporting.  All such mistakes must be fully disclosed and corrected as promptly as possible.  Falsification of business records is strictly prohibited and will result in dismissal and possibly criminal charges as well.

No director, officer or other employee may request or be granted a personal loan by IGC.

All directors, officers and employees must comply with all applicable securities laws regarding insider trading.  Per Section 406 of the Sarbanes-Oxley Act of 2002,

it shall be unlawful for any director, officer or employee to, directly or indirectly, purchase, sell or otherwise acquire or transfer any IGC equity security during any pension fund or ESOP profit sharing plan blackout period.

The directors, officers and other employees must strive to apply high ethical, moral and legal principles in every aspect of their business dealings with their associates, the public, the business community, stockholders, customers, suppliers and governmental regulatory authorities.

All directors, officers and employees must avoid any activities that would involve IGC in any practice that is not in compliance with this Code of Ethics. Any director, officer or other employee who does not adhere to such standards and restrictions is acting outside the scope of his or her employment with IGC.

IGC will not excuse any violation of this Code of Ethics by a director, officer or other employee even if the violation was specifically requested or directed by any of their associates. Only the Board or the Corporate Audit Committee (CAC) can authorize a waiver of this Code of Ethics. See Section 3 of Part B of this Code of Ethics.

Each director, officer and other employee must alert the Board or the CAC, whenever an illegal, dishonest, or unethical act is discovered or suspected by any of their associates. No director, officer or other employee will be penalized by IGC for reporting his or her discovery of such acts or for reporting suspicions of such acts provided that such director, officer or other employee is not a party to or responsible (alone or with others) for such acts.

Conflicts of interests are to be avoided by the directors, officers and other employees. A conflict of interest exists if an individual's actions are, or could reasonably appear to be, influenced, directly or indirectly, by personal considerations or by actual or potential personal benefit or gain.

If a conflict of interest is unavoidable it must be disclosed at the earliest opportunity. Conflicts of interests can arise with respect to financial and business interests, investments, relationships with suppliers, and the offering of prizes, samples, gifts, gratuities or incentives.

31.     The Individual Defendants failed to maintain the standards laid out by both the law

and themselves, resulting in the breaches of fiduciary duty described herein.

## SUBSTANTIVE ALLEGATIONS

### COMPANY BACKGROUND

32.     IGC was organized in Maryland in 2005 and represents that it has two business

segments: legacy infrastructure and medical cannabis-based alternative therapies. The so-called

"legacy business" consists of (i) trading of infrastructure commodities like steel and iron ore, among others; and (ii) rental of heavy equipment.

33.     However, the Company has a history of partaking in a string of disparate business lines while failing to provide competency in any of them:

- In 2008, IGC purchased Indian subsidiaries Sricon and Techni Bharathi Limited, both of which were in the engineering and construction industry.

- In February 2009, IGC purchased IGC-IMT, which was formed just two months earlier, to engage in the business of trading and mining.

- In 2014, IGC:  (i) acquired a controlling stake in Golden Gate Electronics Limited; (ii) entered into an agreement with TerraSphere Systems LLC to produce indoor farming facilities for growing leafy vegetables; and (iii) purchased a 24.9% stake in Midtown Partners & Co., LLC, a firm registered as a broker-dealer.

- In 2016, IGC acquired Cabaran Ultima Sdn. Bhd. ("Cabaran Ultima"), a Malaysia-based "international project development company" with claimed expertise in "building infrastructure to support growing and extraction of medical grade oils from plants," and "managing the construction of high-end luxury complexes." Following the acquisition, IGC claimed to be "operat[ing] a real estate management business" in Malaysia.

- By September 2017, IGC claimed to be "racing ahead with its preparation of medical trials for four drug candidates that treat a variety of debilitating conditions," though, in fact, IGC assigned minimal funding to research and development – approximately $114,000 and $137,000 in fiscal years 2017 and 2018, by IGC's own admission – and none to clinical studies or any of the other

steps needed to obtain U.S. Food and Drug Administration ("FDA") approval for its drug candidates.

- By early 2019, IGC had only succeeded at making Hyalolex – a "non-FDA approved product." Hyalolex is a supplement containing active compounds of the cannabis plant, as well as other active compounds, designed to treat symptoms of Alzheimer's disease.

**IGC FOLLOWS MARKET TRENDS**

34.     In recent years, IGC has repeatedly claimed to enter the most hyped markets in the hopes of boosting its stock price.

35.     In December 2017, after Long Island Iced Tea Corp. sent its stock up 183% by announcing it was changing its name to Long Blockchain Corp., IGC immediately announced that it would leverage its existing team of technology and healthcare experts to develop methods utilizing blockchain in areas such as product identification assurance (or "PIA"). As a result, IGC's stock shot up 91% to $1.26 on December 26, 2017, the Company's first closing share price above the $1 mark since July 2014.

36.     Despite the Company's announcement, however, as of the Company's most recent quarterly filing in February 2019, the Company had yet to deploy the PIA system it boasted to the market about more than a year earlier.

37.     Then in September 2018, discussions of a "green rush" were had by market watchers based on the observation that marijuana stocks were becoming hot items.

38.     Almost immediately thereafter, on September 25, 2018, IGC announced that it was entering "the Hemp/CBD-infused energy drink space" and would begin producing a sugar-free cannabis drink called "Nitro G." In the announcement, IGC claimed that (i) it had entered into a

distribution agreement giving it the right to market Nitro G in, among other places, the U.S.; and (ii) Nitro G would be manufactured in Malaysia.

39.     In response to this announcement, the Company's stock began rising precipitously. A few days later, on October 2, 2018, IGC's stock price hit a high of $14.58 on volume of 19 million shares.  That price was over six times higher, or a 458% increase, than just one week earlier.

40.     To take advantage of this rise in share price, IGC commenced an "at-the-market" (or "ATM") stock offering on September 25, 2018, the same day it announced it was entering the CBD drink market.

41.     The ATM offering closed on October 2, 2018, and IGC was able to raise $30 million of capital at a price of $5.30 per share to take advantage of its skyrocketing share price in late September as follows:



42.     Thus, due to the ATM offering, IGC reported $27 million in cash in its February 12, 2019 quarterly report and a book value of approximately $0.92 per share.

43.     One market observer, writing on the investor blog *Seeking Alpha*, noted that "[t]he capital raise was significant given the company's size and, if maintaining the recent burn rate, could potentially fund IGC's losses for years.  Together, the book value and the cash position could provide support for the stock price."

44.     With respect to the Company's Nitro G announcement, the Individual Defendants stood to benefit most from the surge in IGC's stock price as six of the top seven shareholders, who owned a combined 16.5 percent of all outstanding shares, were defendants Mukunda, Shenoy, Grimaldi, Prins, Goel, and the Company's Chief Scientific Officer, Jagadeesh Rao ("Rao").

**THE INDIVIDUAL DEFENDANTS FAIL TO DISCLOSE THAT IGC WAS LEGALLY BARRED FROM MANUFACTURING NITRO G IN MALAYSIA**

45.     In the September 25, 2018 press release announcing its alleged entry into the CBD market, IGC indicated it would partner with a manufacturer in Malaysia.

46.     However, manufacturing CBD-based beverages was, and still is, illegal under Malaysian law, a fact that the Individual Defendants failed to disclose during the Relevant Period, and which was only revealed to investors upon publication of a *MarketWatch* report on October 28, 2018.

47.     In Malaysia, cannabis is a prohibited or controlled substance governed by several relevant laws, discussed below.  With few exceptions, such as authorized medical and/or scientific persons or bodies (doctors, veterinarians, dentists, pharmacists, hospitals, researchers, or licensed/permit holders), the manufacture, possession, sale, or use of cannabis-based products is unlawful.

48.     For purposes of Malaysia's Dangerous Drugs Act 1952 ("DDA 1952"), CBD is considered to be cannabis, a "dangerous drug" under Section 2 and the First Schedule of the DDA 1952 (Act 234).

49.     CBD, which is a form of cannabis, is prohibited for importing, exporting, manufacturing, possessing, selling, or consuming for personal use or otherwise.  Moreover, the use of or the management of any land/premises by any person (owner or occupier) for such purpose, directly or indirectly, is prohibited.  Accordingly, manufacturing beverages containing CBD violates DDA 1952 and would, therefore, be illegal.

50.     Moreover, under Section 21 of the Poisons Act 1952 (the "Poisons Act") (Laws of Malaysia Act 366), Section 21, read in conjunction with Section 20 of the same Act, cannabis (including CBD) cannot, as a "Group B Poison," be sold or supplied by wholesale or resale except

by a licensed wholesaler to a licensed pharmacist or to another licensed wholesaler, or by a licensed

wholesaler to be immediately exported to a purchaser outside Malaysia.  Licenses would be

obtained under Section 26 of the Poisons Act, which states the following:

> Section 26.  Licenses.
>
> (1)     The Director General of Health, or the Director of Pharmaceutical Services or the Director of Medical and Health Services of any State duly appointed in writing by the Director General of Health to be a Licensing Officer of any State or the Federal Territory may, subject to this Act, issue licenses for the purposes of this Act.
>
> (2)     Such licenses may be-
>
> (a) a Type A license issued to a pharmacist to import, store and deal generally by wholesale and retail or by wholesale only or by retail only, subject to this Act, in all poisons;
>
> (b) a Type B license issued to any person whom the Licensing Officer may consider to be a fit and proper person to hold such license, or issued to a responsible officer of a company incorporated under the Companies Act 1965[Act 125] to import, store and sell by wholesale such poisons (not being a Group A Poison) as may be specified in such license:
>
> Provided that no such license shall be issued to any person or officer who is engaged or ***concerned in any business of selling goods by retail*** or shall continue valid at any time after such person or officer becomes so engaged or concerned[.]

(Emphasis added).

51.     Manufacturing an energy drink product for retail or commercial purposes with

CBD, as IGC announced it would do with its new alleged product, Nitro G, would not qualify

under this provision of the Poisons Act to obtain a license under Malaysian law.  Furthermore,

IGC's alleged Malaysian partner in producing Nitro G, Treasure Network Sdn Bhd ("Treasure

Network"), lists its "nature of business" as "general trading" in its Certificate of Incorporation

under the Malaysian Companies Act 2016, which further disqualifies it from obtaining a license

under the Poisons Act to deal in cannabis.

**TREASURE NETWORK WAS CONTROLLED BY THE INDIVIDUAL DEFENDANTS**

52.    Deliberately, IGC did not name the Malaysian company it was to partner with in its September 25, 2018 press release.

53.    It was not until February 2019, that IGC revealed that its purported Malaysian "manufacturer" for Nitro G was Treasure Network.  Treasure Network was incorporated in Kuala Lumpur on April 7, 2017, less than eighteen months prior to IGC's announcement regarding Nitro G, and did not register its business website domain until October 5, 2018, ten days after the Nitro G announcement.

54.    However, Treasure Network is not a manufacturer, but rather a distributor for Treasure Sugar, a food and beverage company that manufactures its products in Malaysia. Currently, Treasure Network distributes a non-CBD version of Nitro G.

55.    On September 24, 2018, the day before the Nitro G announcement, Chua Seong Seng ("Seng") was appointed as one of four Directors of Treasure Network.  Prior to IGC's Cabaran Ultima acquisition, Seng was Cabaran Ultima's Managing Director.  Following the acquisition, he became a "Senior Advisor" at IGC, a position he currently holds.  Seng also holds a 25% stake in Treasure Network.

56.    Accordingly, the Individual Defendants had the ability to exercise control over Treasure Network at all relevant times, which explains the Company's failure to disclose its identity to investors at the time of the Nitro G announcement.

## THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE FALSE AND MISLEADING STATEMENTS

57.    On October 25, 2017, the Company issued a press release reporting that it had entered into a Memorandum of Understanding with a German firm to import and distribute the

Company's cannabinoid-based therapies in Germany.  The press release entitled *IGC to Distribute*

*its Formulations in Germany in Early 2018* reported:

> Bethesda, MD October 25, 2017 – India Globalization Capital, Inc. (NYSE American: IGC) announced that it **has entered into a Memorandum of Understanding (MOU) with MediCann Handels GmbH, a company based in Hamburg Germany, for the import and distribution of IGC's cannabinoid based therapies including IGC-AD1 (Hyalolex) to pharmacies in Germany**.
>
> MediCann plans to distribute to pharmacies, apothecaries and other licensed retail outlets that are legally allowed to sell cannabinoid-based products.  Under the current MOU, MediCann will provide the capital required for the transportation, import, storage, sales and marketing of products intended for the German market.  The agreement is subject to standard closing conditions such as due diligence relating to satisfactory licensing and product procurement.
>
> "There are many benefits to developing a strong presence in the German pharmacy market including, a favorable regulatory environment and reimbursement from health insurance providers.  The agreement with MediCann is the first step in the commercialization process of our therapies, as we work out the logistics of how to efficiently deliver our products to Germany," states Ram Mukunda, CEO.  "We are glad to add the products of IGC to our portfolio.  With these products we will have a unique selling point in the German market," states Carsten Siegemund, CEO of MediCann.

(Emphasis added).

57. On November 17, 2017, the Company filed its quarterly report with the SEC for

the quarter ended September 30, 2017 on Form 10-Q (the "2017 Q2 10-Q"), which was signed by

Defendants Mukunda and Goel.

59. The 2017 Q2 10-Q stated the following regarding the Company's internal controls

and procedures:

> **Evaluation of Disclosure Controls and Procedures**
>
> As of the end of the period covered by this report, management conducted an evaluation, under the supervision and with the participation of its Chief Executive Officer (CEO) and its principal financial and accounting officer (PFAO), of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934.  Based upon that evaluation, **our CEO and PFAO concluded that our disclosure controls and procedures are effective** to ensure that information required to be

disclosed by the Company in reports under the Exchange Act is recorded, processed and reported within the time periods specified in the SEC rules and forms; and accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

### Changes in Internal Control over Financial Reporting

There were no changes in our internal controls over financial reporting during our fiscal quarter ended September 30, 2017 which were identified in conjunction with Management's evaluation required by paragraph (d) of Rule 13a-15 and 15d-15 under the Exchange Act that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

(Emphasis added).

60.     The 2017 Q2 10-Q contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Mukunda and Goel, attesting to the accuracy of the 2017 Q2 10-Q.

61.     On December 7, 2018, the Company issued a press release entitled *India Globalization Capital Launches New Corporate Websites Highlighting Canna-Pharmaceutical Compound Portfolio*.  The press release reported:

Bethesda, December 7, 2017 (GLOBENEWSWIRE) – India Globalization Capital, Inc. (NYSE American: IGC), today announced that it has **launched two new websites to detail the Company's cannabinoid pipeline for the indications of pain, seizures, eating disorders and Alzheimer's.**  Investors are encouraged to visit www.igcpharma.com and www.Hyalolex.com for the latest information on IGC's initiatives and development timeline.

*       *       *

IGC's Alzheimer's drug candidate, IGC-AD1 (Hyalolex), works through a molecular pathway that allows low doses of IGC-AD1 to:  1) modulate Aβ protein production, 2) inhibit Aβ protein aggregation, 3) reduce Tau phosphorylation, 4) enhance mitochondria function, and 5) help redirect the immune system, with none of the side effects commonly associated with cannabis.  Based on these and other studies we expect to bring IGC-AD1 to market in early 2018, with the hope of bringing much needed relief to Alzheimer's patients.

"Our initial focus on the canna-pharmaceutical front is on Alzheimer's, America's most expensive disease.  In 2017, the direct cost of treatment for Alzheimer's and

other dementias is projected to cost the U.S. approximately $259 billion.  Roughly 5.3 million individuals in the U.S. alone suffer from the disease, and the number is expected to double over the next 20 years.  As such, *we believe the market for Alzheimer's disease represents tremendous potential for our cannabis-extract-based compounds.*  Our longer-term goal, based on adequate funding, is to move our Alzheimer's formulation through FDA registered pre-clinical and clinical trials.  Independent of the FDA process, our near-term goal is to commercialize our liquid formulation for Alzheimer's as a Complimentary and Alternative Medicine (CAM) sold through licensed medical cannabis dispensaries in the U.S., and internationally in Canada and Germany," stated Ram Mukunda, CEO of IGC.

(Emphasis added).

62.     On December 26, 2017, the Company issued another press release, reporting that the Company intended to use blockchain technology to address issues in the medical cannabis industry.  This announcement came as the prices for cryptocurrencies, including Bitcoin and Ethereum, were at or near all-time highs, and shortly after Bitcoin futures started trading. The press release provided:

**India Globalization Capital to use Blockchain to Address Issues Specific to the Medical Cannabis Industry**

Bethesda, December 26, 2017 (GLOBENEWSWIRE) – India Globalization Capital, Inc. (NYSE American: IGC), *today announces that it will leverage its existing team of technology and healthcare experts to develop methods utilizing blockchain in areas such as product identification assurance (PIA)*.  According to a recent study that was published in JAMA and detailed on www.pennmedicine.org, nearly 70% of all cannabidiol products sold online are either over or under labeled.

"We understand the unique challenges facing the cannabis industry and believe that our team has the expertise to be the first to create meaningful solutions to address these issues using distributed ledgers inherent in blockchain technology.  *As we work to develop blockchain in the rollout of Hyalolex, our goal would be to establish a universal cannabis platform applicable to solving multiple industry challenges facing dispensaries and consumers.  This would include addressing issues such as transactional difficulties, inadequate product labeling, product identification assurance (PIA) and product origin assurance,*" stated Ram Mukunda, CEO.

(Emphasis added).

63.     On January 2, 2018, the Company issued a press release entitled *India Globalization Capital Reports Promising Spatial Memory Results in Alzheimer's Study*.   That press release quoted Defendant Mukunda outlining the following key objectives for 2018:

> "We are preparing the groundwork necessary to get Hyalolex, our lead product formulation for Alzheimer's ready for Phase 2-B human trials.  Independent of this, we expect to make the product available through medical dispensaries in select states of the U.S.  In addition, *we are working on addressing issues specific to the medical cannabis industry such as transactional difficulties, inadequate product labeling, product identification assurance (PIA) and product origin assurance (POA), using distributed ledgers inherent in blockchain technology*.  We are ready for an exciting 2018," concluded Mr. Mukunda.

(Emphasis added).

64.     On February 12, 2018, the Company issued a press release entitled *India Globalization Capital's CEO to Speak at CEO Healthcare Symposium in NY on February 12 & 13*.  That press release quoted Defendant Mukunda as outlining the following key objectives for 2018:

> "We are preparing the groundwork necessary to prepare Hyalolex, our lead product formulation for Alzheimer's ready for Phase 2-B human trials.  Independent of this, we expect to make the product available through medical dispensaries in select states of the U.S.  In addition, *we are working on addressing issues specific to the medical cannabis industry such as transactional difficulties, inadequate product labeling, product identification assurance (PIA) and product origin assurance (POA), using distributed ledgers inherent in blockchain technology*.  We look forward to an exciting 2018 and I wish to thank [event sponsor] YJP for the opportunity to speak at their CEO Healthcare Symposium  alongside prestigious leaders and innovators in the healthcare industry," commented Ram Mukunda, CEO.

(Emphasis added).

65.     On February 20, 2018, the Company filed its quarterly report with the SEC for the quarter ended December 31, 2017 on Form 10-Q (the "12/31/17 Q3 10-Q").  The 12/31/17 Q3 10-Q was signed by Defendants Mukunda and Goel.

66.     The 12/31/17 2018 Q3 10-Q stated the following regarding the Company's internal controls and procedures:

### *Evaluation of Disclosure Controls and Procedures*

As of the end of the period covered by this report, management conducted an evaluation, under the supervision and with the participation of its Chief Executive Officer (CEO) and its principal financial and accounting officer (PFAO), of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934. Based upon that evaluation, **our CEO and PFAO concluded that our disclosure controls and procedures are effective** to ensure that information required to be disclosed by the Company in reports under the Exchange Act is recorded, processed and reported within the time periods specified in the SEC rules and forms; and accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

### *Changes in Internal Control over Financial Reporting*

There were no changes in our internal controls over financial reporting during our fiscal quarter ended December 31, 2017 which were identified in conjunction with Management's evaluation required by paragraph (d) of Rule 13a-15 and 15d-15 under the Exchange Act that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

(Emphasis added).

67.     The 12/31/17 Q3 10-Q contained SOX certifications signed by Defendants Mukunda and Goel attesting to its accuracy.

68.     On March 26, 2018, the Company issued a press release announcing that Hyalolex would be hitting the shelves in Puerto Rico starting in April 2018.  The press release stated:

Alzheimer's patients in Puerto Rico will be the first in the United States to obtain Hyalolex, IGC's proprietary cannabinoid-based formulation aimed at relieving many of the symptoms of Alzheimer's Disease, such as agitation, anxiety, sleep disorder, as well as caregiver distress, among others.  Pursuant to an agreement between IGC and DaMa Pharmaceutical and its affiliates, Hyalolex will be on the shelves in April, and available to patients in ten of Puerto Rico's 30 dispensaries, including the two premier dispensaries in San Juan, the largest city in Puerto Rico. Under the licensing terms DaMa will help produce Hyalolex in Puerto Rico, and market Hyalolex to medical dispensaries and end users.  Hyalolex will be prescribed

as a liquid supplement in twice-daily doses for mild to moderate Alzheimer patients, and thrice-daily doses for moderate to advanced patients.

69.     The press release further stated:

"*We are very pleased to work with the DaMa Pharmaceutical team to bring Hyalolex to Puerto Rico, which has a long history of developing premier pharmaceutical products*," said Ram Mukunda CEO of IGC.  He noted that the Puerto Rican government has been a supporter of a comprehensive medical cannabis program.  "We are proud to be a contributor to Puerto Rico's economic development and to the wellbeing of its Alzheimer's patients", he said.  According to alz.org, Hispanics are approximately one and one-half times as likely to have Alzheimer's as non-Hispanic whites.

"This is a decisive step in delivering our cannabis intellectual property to patients, after many years of development.  It is particularly important as part of our effort to establish a distribution network to productize our IP," Mukunda said.

This partnership represents a significant opportunity to provide those afflicted with Alzheimer's with potential relief from a very difficult diagnosis and ease the burden of their caregivers who attend to them.  It also represents a significant opportunity to collect data on Hyalolex's performance within a diverse patient set", said Mukunda.  *IGC will deploy a QR code-based product assurance, information dissemination, and data collection system as a step towards a more robust block chain-based product assurance system*.

(Emphasis added).

70.     On June 21, 2018, the Company issued a press release announcing its financial results for the fiscal year ended March 31, 2018.  With respect to the Company's purported use of blockchain technology, that press release stated:

The Company has developed and deployed a QR code-based system that allows patients to access a website with specific information on Hyalolex.  Each QR code is specific to a state and displays information specific to that state.  We are in the process of creating a mobile optimized version that will expand the product information available to patients to include location of dispensaries that carry our products, based on zip code, and in turn also allow us to gather information through surveys and obtain feedback from patients.

*As the number of states in which the product is available increases, we expect to expand the backend to a blockchain that allows for inputs directly from growers, processors, and dispensaries*.  This information will collectively display product identification, and product origination, by providing the patient with information

regarding the origin, chemicals, and processes used to manufacture the product. We expect to expand the QR code-based system in several phases over fiscal 2019.

(Emphasis added).

71.     On June 21, 2018, the Company filed its Form 10-K with the SEC for the fiscal year ended March 31, 2018 (the "03/31/18 Form 10-K"). The 03/31/18 Form 10-K was signed by Defendants Mukunda, Grimaldi, Goel, Prins, and Shenoy.

72.     The 03/31/18 Form 10-K asserted that the Company operates in two business segments – Legacy infrastructure and alternative therapies. Regarding the Company's legacy infrastructure business, the 03/31/18 Form 10-K stated:

> *Since our inception, we have participated in various aspects of the infrastructure industry. During the fiscal year 2018, we streamlined our legacy infrastructure business to infrastructure commodity trading, and heavy equipment rental*. We trade infrastructure commodities like steel and iron ore, among others, and we rent heavy equipment. Our subsidiary, Techni Bharathi Private Ltd ("TBL") in India is responsible for heavy equipment rental, and its subsidiary IGC Enterprises Ltd. in Hong Kong is responsible for infrastructure trading.
>
> For the rental business, we supply equipment and operators to construction companies. This business is very small and limited to the city of Kochi in Kerala, India. In fiscal year 2018 we have three customers all of which are construction companies. For the trading business we have four customers and no principal supplier. We are opportunistic and will buy from any of the South Asian countries. In fiscal 2018 our suppliers are companies based in India and Hong Kong. For the level of business and the value of each trade, the number of customers we have is adequate and does not constitute inordinate customer risk. Revenue from our legacy infrastructure business including heavy equipment rental and commodity trading is less than 1% based on revenue of both the rental and trading markets. This business is highly competitive, and our differentiation is based primarily on price and industry knowledge of commodity requirements for infrastructure projects. Our strategy in fiscal 2019 for the legacy business is to maintain annual revenue of $3-$5 million and focus on growing margin by reducing the cost of money and by modest investments in heavy equipment.

(Emphasis added).

73.     The 03/31/18 Form 10-K continued:

The pricing for steel and iron ore are heavily influenced by tariffs and demand for infrastructure development. In fiscal year 2018, steel prices although down from

fiscal 2017, fluctuated in a relatively narrow band as did iron ore prices.   We do not hedge or take long term positions on commodities.   We limit our exposure by contractually ensuring that every purchase has a vetted legitimate buyer and ensuring rapid closing of transactions.   On a transaction basis, this business does not require special government approvals.   We have the requisite business licenses that allow us to operate in this segment.

In the fiscal years ending March 31, 2018 and 2017, we funded our subsidiary TBL $75,000 and $43,000 for working capital, respectively.   For the trading business our sales team is in Hong Kong and the sales cycle lasts between two and three months.   For our equipment leasing business our sales team is in Kochi, India, where the sales cycle lasts around two months.   In Malaysia, through our subsidiary Cabaran Ultima, we operated a real estate management business.   During the fiscal year 2018, we decided to exit this business and as of March 31, 2018, we have accounted for our investment in Cabaran Ultima as "Investment Held for Sale" at a fair value of $147,500.   We hope to sell Cabaran Ultima during fiscal year 2019.   Please see Note-22, "Investment Held for Sale" for more information.

74.     Regarding the Company's alternative therapies segment, the 03/31/18 Form 10-K

stated:

> ***We focus on the development and commercialization of cannabinoid-based combination therapies***.   Cannabinoids are chemical compounds that exert a range of effects on the body, including impacting the immune response, gastrointestinal maintenance and motility, muscle functioning, and nervous system response and functioning.   Phytocannabinoids are cannabinoids that occur naturally in the cannabis plant.   Phytocannabinoids are abundant in the viscous resin produced by glandular structures called trichomes.   There are over 480 different compounds in the cannabis plant.   Many of them have been identified as cannabinoids.   Of these, THC (delta-9-tetrahydrocannabinol) is the main psychoactive component in the plant with many therapeutic uses.   The other broadly pursued non-psychoactive phytocannabinoid, CBD (Cannabidiol), is pleiotropic influencing many pathways in humans, dogs, and cats, and may be used to provide relief to a variety of symptoms including pain, seizures, and eating disorders.   In medical applications, cannabinoids are extracted from the cannabis plant using a variety of well-established technologies, including using $CO_2$, butane, alcohol, among others, as solvents.   The refined extracted material is isolated for specific active ingredients like THC and CBD, among others, and used in formulations as the primary or secondary active ingredient.

> Our work and strategy are to use cannabinoids synergistically with other active ingredients that in many cases have been established to treat specific conditions.

> We seek, through the synergies for our combination therapies, to decrease side effects, increase bio-availability, and enhanced efficacy.   This strategy in some

cases leads to "new and improved" products, and in others it results in totally novel products with surprising results, as in the case of Hyalolextm.

We have filed eight provisional patents with the United States Patent and Trademark Office ("USPTO"), in the phytocannabinoid-based combination therapy space, for the indications of pain, medical refractory epilepsy, and cachexia. In addition, in May 2017, we acquired an exclusive license to a patent filed by the University of South Florida Research Foundation entitled "Cannabidiol and Synthetic Dronabinol for treatment of Alzheimer's Disease."

(Emphasis added).

75.     Regarding the Company's marketing plan for Hyalolex, the 03/31/18 Form 10-K stated:

As the final product contains a controlled substance, although in micro-doses, it can only be manufactured by a state licensed entity that conforms to all relevant state regulations. The reseller will have the product manufactured and delivered to state licensed dispensaries where they can be sold consistent with state laws governing the sale of products containing cannabinoids. The product will only be available to patients in medical states that are registered through specific state sanctioned programs. To ensure compliance and product assurance we are developing a QR code (Quick Response code) supported system that will track the product and allow patients to access information about the product and also provide feedback. To this, *we plan to add a backend based on blockchain technology that will go much further in ensuring compliance, product authenticity and product origin.*

(Emphasis added).

76.     The 2018 10-K stated that the Company possessed a "Competitive Advantage," stating:

We believe that there are three factors coalescing to create entrepreneurial opportunities in the cannaceutical industry. The first is deregulation of the industry. This is taking place in the U.S., Canada, Germany, and other parts of the world. We believe that during any major deregulation, it takes several years for market equilibrium to be achieved. Most large companies don't react quickly and that creates entrepreneurial opportunities, including as a first mover. The second factor is that the plant has cannabinoids that work on several pathways, in humans and animals, and that these cannabinoids can potentially be used to treat many diseases and aliments. The third factor is a rising awareness and demand for natural products including natural complementary and alternative medicines.

77.     Regarding the Company's disclosure controls, the 03/31/18 Form 10-K stated:

As of the end of the period covered by this report, management conducted an evaluation, under the supervision and with the participation of its Chief Executive Officer (CEO) and its principal accounting officer (PAO), of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934.  Based upon that evaluation, *our CEO and PAO concluded that our disclosure controls and procedures are effective*.

Disclosure controls and procedures are defined by Rules 13a-15(e) and 15d-15(e) of the Exchange Act as controls and other procedures that are designed to ensure that information required to be disclosed by us in reports filed with the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.   Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports filed under the Exchange Act is accumulated and communicated to our management, including our CEO and PAO, or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure.

(Emphasis added).

78.    Regarding the Company's Code of Ethics, the 03/31/18 Form 10-K stated:

A code of business conduct and ethics is a written standard designed to deter wrongdoing and to promote (a) honest and ethical conduct, (b) full, fair, accurate, timely and understandable disclosure in regulatory filings and public statements, (c) compliance with applicable laws, rules and regulations, (d) the prompt reporting violation of the code and (e) accountability for adherence to the code.   The Company has adopted a written code of ethics (the "Code of Ethics") that applies to the Company's Chief Executive Officer and senior financial officers, including the Company's Principal Accounting Officer, Controller, and persons performing similar functions (collectively, the "Senior Financial Officers"), in accordance with applicable federal securities laws and the rules of the NYSE American, and to all employees.  Investors may view our Code of Ethics on the corporate governance subsection of the investor relations portion of our website at www.igcpharma.com.

79.    The 03/31/18 Form 10-K contained SOX certifications signed by Defendants Mukunda, Grimaldi, and Goel, attesting to the accuracy of the 03/31/18 Form 10-K.

80.    On July 10, 2018, the Company issued a press release announcing its 2018 Annual Meeting of Stockholders.   The press release included an annual letter to stockholders from Defendant Mukunda:

Our flagship product is a first in the cannabis industry and is based on years of research that resulted in a patent filing, which we acquired from the University of South Florida.  The liquid formulation, Hyalolex, that we have tagged as 'drops of clarity' is novel and studies show that its active ingredients can potentially help alleviate symptoms and lead to better management of Alzheimer's patients. Worldwide, about 44 million people suffer from Alzheimer's that is responsible for 70-80% of all dementia, and there is no cure.  Our strategy for the next year is to license Hyalolex, state by state, for sale in legal dispensaries as a complementary medicine.  We expect to first focus on the East Coast followed by the West Coast and then Canada.

In 2018 we worked on a QR-code based product assurance, information dissemination, and data collection system.  In 2019 we expect to create a mobile optimized version that will expand the product information available to patients to include location of dispensaries that carry our products, based on zip code, while simultaneously allowing us to gather valuable data and feedback through patient's surveys.  *The blockchain based backend will allow for inputs directly from growers, processors, and dispensaries.  This information will collectively display product identification, and product origination, by providing the patient with specific details regarding the origin, chemicals, and processes used to manufacture the product.  We expect this to be another industry first.*

Over the past 4 years we have spent our energy in the medical cannabis industry that has culminated in the development of a flagship product, which we are in the final stages of launching.

(Emphasis added).

81.     On August 6, 2018, the Company issued a press release announcing the results of its 2018 Annual Stockholders' meeting. The press release stated:

### Hyalolex Initiatives / Drops of Clarity Program

Alzheimer's disease (AD) is a form of dementia.  It is known as America's most expensive disease, with an estimated cost to the U.S. economy of $236 billion.  AD currently affects more than 5.3 million Americans and over 65% of AD patients are women.

We are pleased to launch our first marketing and branding campaign, titled 'Drops of Clarity' in support of Hyalolex, our product whose active ingredients have been shown to be beneficial for patients suffering from tested on [sic] Alzheimer's.

Our program will highlight the potential benefits of Hyalolex as a supplement to authorized cannabis physicians as well as to caregivers and patients via both a digital format and through grassroots outreach.  We expect to utilize this

methodology, in conjunction with licensing arrangements with manufacturers, to expand our reach into multiple U.S. markets and Canada.

**Blockchain Initiatives / Product Labeling, Identification and Origin Assurance**

The Company is focused on the development of a QR code-based system that allows patients to access a website with information on our alternative medicine products, specific per state. ***As the number of states in which the product is available increases, we expect to expand the backend to a blockchain that allows for inputs directly from growers, processors, and dispensaries. This information will collectively display product identification and product origination by providing the patient with information regarding the origin, chemicals, and processes used to manufacture the product***. We expect to expand the QR code-based system in several phases over fiscal 2019.

(Emphasis added).

82.     On October 16, 2018, the Company filed its quarterly report with the SEC for the quarter ended September 30, 2018 on Form 10-Q (the "09/30/18 Q2 10-Q"), signed by Defendants Mukunda and Grimaldi.

83.     In relevant part, the 09/30/18 Q2 10-Q stated the following regarding the Company's internal controls and procedures:

***Evaluation of Disclosure Controls and Procedures***

As of the end of the period covered by this report, management conducted an evaluation, under the supervision and with the participation of its Chief Executive Officer (CEO), its principal financial officer (PFO) and its principal accounting officer (PAO), of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934.  In designing and evaluating the disclosure controls and procedures, our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives.  In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that our management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based upon that evaluation, our CEO, PFO and PAO concluded that our disclosure controls and procedures were designed a reasonable assurance level and were effective to reasonably ensure that information we are required to disclosed [sic] in reports under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and that such

information is accumulated and communicated to the Company's management, including its principal executive officer, principal financial officer and principal accounting officer, as appropriate, to allow timely decisions regarding required disclosures

### Changes in Internal Control over Financial Reporting

There were no changes in our internal controls over financial reporting during our fiscal quarter ended September 30, 2018, which were identified in conjunction with Management's evaluation required by paragraph (d) of Rule 13a-15 and 15d-15 under the Exchange Act that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

(Emphasis added).

84.     The 09/30/18 Q2 10-Q also stated:

On October 4, 2018, we filed a provisional method and composition patent application (IGC-509) with the U.S. Patent and Trademark Office (USPTO) for the treatment of fatigue and energy restoration. ***This patent filing is one of a series of steps in the Company's development and commercialization plan to support the creation of a branded, hemp/CBD sugar-free energy drink, which was previously disclosed by the Company on September 25, 2018***.

(Emphasis added).

85.     The 09/30/18 Q2 10-Q further stated that "[t]he Company recently entered the hemp oil/cannabidiol (CBD) infused beverage space and expects to bring a sugar free CBD infused energy drink to market."

86.     The 09/30/18 Q2 10-Q contained SOX certifications signed by Defendants Mukunda and Grimaldi attesting to its accuracy.

87.     On September 25, 2018, the Company issued a press release entitled, *IGC to Enter the Hemp/CBD-Infused Energy Drink Space*, which announced the Nitro G venture. The press release stated:

BETHESDA, MD September 25, 2018 – India Globalization Capital, Inc. (NYSE AMERICAN: IGC) announces today that it has executed a distribution and partnership agreement for several products including a sugar free, energy drink called 'Nitro G'.

IGC will pay 797,000 shares of restricted, unregistered, common stock, for a 10-year agreement, with an option for multiple 5-year extensions, ***for the rights to market the products in the U.S., Canada, Mexico and South America and exclusive global rights to all developed CBD-infused product***s.

IGC plans to create a branded, hemp/CBD-infused version of the formulation that addresses market demand for energy drinks with the inclusion of healthy properties derived from hemp including CBD.

(Emphasis added).

88.     The press release also quoted Defendant Mukunda:

"According to a Grand View Research forecast, the global energy drinks market is projected to be almost $85 billion by the year 2025, with non-alcoholic beverage sales expected to account for a significant portion of the market.  This represents a unique opportunity for the development and commercialization of a CBD-infused, sugar free energy beverage," stated Ram Mukunda, CEO of IGC.

"***By combining the experience of IGC with Hyalolex with the manufacturer in Malaysia***, we potentially bring together unique expertise in microencapsulation, solubility, infusion, controlled dose delivery, and sugar free processes, among others.  ***This will help introduce an exciting CBD-infused energy drink to the market and the acquired knowledge base can be further leveraged to diversify the delivery method for IGC branded products including Hyalolex^tm, our flagship product for patients suffering from Alzheimer's***," continued Mukunda.

This transaction is particularly timely given the language of the 2018 Farm Bill that currently addresses potentially legalizing, on a federal level, industrial hemp and products derived from it, including hemp oil that contains CBD.

(Emphasis added).

89.     The statements referenced in paragraphs ¶¶57-88 above were false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects in an effort to artificially inflate the value of IGC stock.  Specifically, the Individual Defendants failed to disclose that:  (i) India Globalization substantially discontinued the business that it conducted at the time it began trading on the NYSE; (ii) the Company had become engaged in ventures or promotions which have not developed to a commercial stage; (iii) cannabis-based products, including CBD-based beverages, are illegal in Malaysia; (iv) neither IGC nor Treasure

Network was a licensed manufacturer of cannabis-based products in Malaysia; (v) CBD-infused Nitro G was not an approved and registered product under Malaysian law; (vi) Treasure Network, founded in 2017, was not "experienced"; (vii) Treasure Network was a distributor, not a manufacturer; (viii) at all relevant times, the Individual Defendants had the ability to exercise substantial control over Treasure Network; (ix) consequently, the Company was not an operating company for the purposes of continued trading and listing on the NYSE American; and (x) as a result, India Globalization's public statements were materially false and misleading at all relevant times.

## THE TRUTH SLOWLY EMERGES

90.     On October 2, 2018, *Citron Research* began tweeting about the Company, reporting that the Company had "No product," and was "All hype."  *Citron Research*'s 11:08 a.m. tweet asserted:  "This hype stock is the poster child of a cannabis bubble.  Always cautious but nothing but air.  Could write pages about this scheme."

91.     In a second tweet, posted just ten minutes later, *Citron Research* reported:

$IGC has raised money 3 times in 3 weeks at an average price of $3.31. At least the company is honest about the absurd move[.]  The stock should have a skull and crossbones at Fidelity.  Just praying for more borrow to open up.  Target price – $6 fast.

92.     Following the Citron tweets, market observers began to scrutinize the Company, uploading photos of the address listed on IGC's June 21, 2018 annual report.  Google Street View images from September 2017 showed a small suburban home also known as "Arbol House," a child care center that Google lists as permanently closed:



93.     The Company's stock closed at a high of $13.00 on October 2, 2018.  The following

day, the price of the Company's stock closed at $8.85, a decline of $4.15 or 31.9%.

94.     Before markets closed on October 4, 2018, *MarketWatch* published an article about

the Company entitled "All the potential red flags for investors in IGC, the pot stock that jumped

1,000% in three months."   The article's subtitle stated that "[t]he stock has rocketed since the

company announced it planned a line of CBD-infused drinks, but details remain scant."  The article

continues in relevant part:

> A review of the company's [] history and regulatory filings has uncovered an
> alarming number of red flags that undermine some of the claims made by the
> company and demonstrate the importance of due diligence when investing.

The stock's move came after the company announced its plan for a line of CBD-infused drinks, or those containing cannabinoids, ingredients in cannabis that are said to have health benefits.  With Canada gearing up for full legalization of cannabis for adult recreational use on Oct. 17, the sector has become a hot market for speculators, with investors jumping on every announcement of a planned product, alliance, distribution agreement or deal.

IGC has benefited – its market capitalization has ballooned to $295 million on Thursday from just $78 million on Sept. 25, the day before the drinks announcement.

*      *      *

In its most recent quarterly earnings report, IGC posted a loss of $512,296 on revenue of $1.5 million for the three months [] end[ed] June [30, 2018].  Cost of revenue came to $1.4 million, while SG&A costs came to $553,645, which exceed its revenue.

MarketWatch has spent several days calling and emailing IGC, its executives and the scientists whom it names as advisers on its website.  Founder and Chief Executive Ram Mukunda returned a call on Wednesday, before asking for time to read the questions we had emailed him with the promise he would call back.  On Thursday, the company said it would provide answers to our questions.  It has not done so at this time.

*      *      *

Made in Malaysia?

In the release announcing the plan for CBD-infused drinks, ***IGC indicates it will work with a manufacturer in Malaysia, but that country has a mandatory death sentence for cannabis possession and has no medical-marijuana program***.

"***Marijuana or any form of products including CBD oil is illegal in Malaysia***," Erny Sabrina Mohd Noor, counselor for agriculture at the Malaysian Embassy in Washington, D.C., told MarketWatch.

*      *      *

***IGC***, which started life in 2005 as a blank-check company, ***has a history of pivoting to new businesses as they become popular and releasing press releases to highlight those business-plan shifts***.

The company's IPO prospectus said that it aimed to acquire or merge with businesses operating in India, to take advantage of the potential of that market.  In 2007, it began to acquire infrastructure assets in Asia and later started trading commodities such as steel and iron ore, leasing heavy construction equipment and managing real estate in Malaysia, according to its website.  Today, the SEC-

36

registered area of business is described as "wholesale electronic parts and equipment."

In 2013, the company started to look into the cannabis industry, where it now claims to be working on treatments for serious diseases including Alzheimer's and Parkinson's, as well as anxiety and sleep disorders.

*However,* a review of its regulatory filings reveals that it has assigned very little funding to research and development – roughly $150,000 a year – and none to clinical studies or any of the other steps needed to win U.S. Food and Drug Administration approval.

*     *     *

On Dec. 29, a proposal to approve the grant of 1.9 million shares of stock to "current and new employees, advisers, directors and consultants by the board of directors" passed a shareholder vote.

In mid-September, Level Brands Inc.'s stock [] more than doubled in four days, just before the company announced on Sept. 21 the online launch of five new cannabidiol (CBD) products under the Kathy Ireland Health & Wellness brand.  The stock ran up as much 24% during the day of the announcement, before reversing course to close the session down 12%.

***Four days later, IGC said it was entering the market for CBD-infused energy drinks, with "plans to create a branded hemp/CBD-infused version of the formulation that addresses market demand for energy drinks with the inclusion of healthy properties derived from hemp including CBD."  In other words, the product, called "Nitro-G," was still in the planning stages.  Still, the news helped kick off a near sixfold rise – the stock ran up 458% – over the next five sessions.***

On cue, the company disclosed late Tuesday it had completed its at-the-market offering of 5.65 million shares at a weighted average price of $5.30, which was more than double the closing price of $2.33 on Sept. 25, when the offering commenced.  Coincidentally, Sept. 25 was the day IGC said it was entering the market for CBD-infused energy drinks.

The stock tumbled 32% in afternoon trade Friday, putting it on track for the biggest one-day selloff since going public in April 2006.  It has plummeted 66% the past three sessions.

*     *     *

IGC went public on May 13, 2005, led by Ram Mukunda, who has since served as chairman of the board, CEO and president.  Mukunda was previously founder and CEO of a company called Startec Global Communications, according to a biography on his company website.  The bio fails to disclose that Startec went bankrupt in 2001, having defaulted on a $9.6 million interest payment.

37

IGC started in 2005 with $200,000 in assets, a $100,000 loan payable to Mukunda and an obligation to pay Mukunda's company, Integrated Global Network LLC, an administrative fee of $7,500 a month for office space and general and administrative services. John Cherin, an Arthur Andersen alumnus, served as chief financial officer until he was replaced by Rohit Goel and Shajy Mathilakathu as co-principal accounting officers on Sept. 29, 2017.

\*       \*       \*

**The company has attracted a lot correspondence from the SEC**. In March 2017, the SEC wrote to ask about a 2009 transaction with Bricoleur Capital Management, an investment adviser. The loan from Bricoleur to IGC has been renegotiated several times.

IGC's financial statements filed with the SEC as of June 30, 2017, said the company had issued 90,000 shares valued at $36,600 to Bricoleur Partners L.P. against the outstanding $1.8 million promissory note as repayment of interest. Bricoleur's SEC registration was terminated in December 2012, and its license was revoked by the state of Florida in 2015.

**IGC has received nine late-filing notices from the New York Stock Exchange in just the past three years, prompting the SEC to ask over and over when it is going to comply with the rules**. IGC received another notice of delisting from the NYSE in October 2017 and had to ask the SEC for an extension to file and hold a shareholder meeting. The company had still not held a shareholder meeting by December 2017, and it got another notice from the SEC asking when it would comply with its exchange's rules.

The company finally caught up on its filings, averting a NYSE delisting by issuing its annual report and 10K on June 21 and holding a shareholders meeting on August 6. An SEC spokeswoman declined comment on the company.

\*       \*       \*

The Dama Pharma company in Puerto Rico appears to have been created just in **time for an IGC press release,** headlined "Puerto Rican Alzheimer's Patients to Be First in U.S. to Obtain Cannabis-Based Relief" **on March 26, 2018**. **It was incorporated three days before the press release was sent out**.

DaMa Pharma says it is "a medical cannabis manufacturing company, and a Clinical Research Organization (CRO) for conducting clinical trials on cannabis-based products" and has a LinkedIn profile, but its website is incomplete. DaMa Pharma's only employee is Stephen Inglis, who is also CEO of a company called InPortal USA.

InPortal is a facilitator, providing "Compliant Market Access through an equity capital markets (ECM) and a debt capital markets (DCM) platform with a dedicated public corporate landing site and controlled investor access to a deal data room."

*     *     *

IGC's German distribution partner was said to be ready to "distribute its formulations in Germany in early 2018," according to a press release from October 2017.

Between Oct. 25, when the press release was issued, and Nov. 3, IGC's Mukunda sold 200,000 shares of IGC stock.  There was no further mention in SEC filings of this business partnership and no further press releases.

Medicann is a German "medical marijuana retailer website," and its listed CEO is Carsten Siegemund. Medicann was created with just 25,000 euros in capital on May 31, 2017.

*A search of the site finds no mention of the IGC product Hyalolex, which it claims can treat symptoms of Alzheimer's disease.*

*The site itself is a work in progress, since the map shows the center of Central Park in New York, and the answers to FAQ questions are "lorum ipsum" – filler text often used in place of the eventual content of new website templates and other yet-to-be-published materials*.

Cartsten Siegemund helps distribute products for other penny-stock companies besides IGC.  One press release touts a 3.7 million euros [] distribution agreement, pretty big business for a company started six months earlier with a €25,000 investment.

*     *     *

On Nov. 8, 2017, the company's shareholders ratified the appointment of AJSH & Co. LLP as IGC's independent registered public accounting firm for the 2018 fiscal year, according to an SEC filing.  AJSH had been the company's auditor since 2013.

On March 16, the company suddenly announced it had changed its mind and decided to dismiss AJSH & Co. as its audit firm, with no replacement named.  An SEC filing said that "after five years with the same independent public accounting firm, as a matter of good corporate governance, it was appropriate to change to a different firm."

On April 6, the SEC obtained a judge's order to freeze $27 million that it characterized as proceeds from illegal sales of shares of LongFin Corp.[], a brand-new audit client of AJSH & Co.  When LongFin went public in December 2017, it was a poster child for shortcut "mini-IPO" rules known as Reg A+, according to an article in Barron's.

There's one additional connection between LongFin's auditor AJSH and IGC.

Rohit Goel, based in Delhi, India, became IGC's principal accounting officer in September 2017, according to the company's website. Goel previously worked for AJSH from April 2014 to August 2016, according to his LinkedIn profile. That profile also states that he runs BnA Consultancy, an accounting and management consultancy firm, from April 2015 – before he left AJSH – to the present. IGC told the SEC that Goel joined the firm full-time on Sept. 27, 2017 and would serve as a co–principal accounting officer.

(Emphasis added).

95.     Additionally, the article stated that the Company's Chief Scientific Officer, Rao, had falsified data in scientific journals, resulting in his boss having to resign from the National Institutes of Health. Lastly, the article revealed that the Company had used paid stock promoters to bump up its stock price.

96.     On this news, the price of the Company stock dropped $2.44 per share, or 27.6%, from its closing price on October 3, 2018, to close at $6.41 per share on October 4, 2018.

97.     The price of the Company stock continued to fall the following day, closing at $4.05 on October 5, 2018, representing a 36.8% decline from the closing price on October 4, 2018, and a 54.2% decrease from the closing price on October 3, 2018.

98.     IGC did not issue a response, or deny, the explosive claims made in the *MarketWatch* report. Instead, on October 5 and 6, 2018, the Company, through its Twitter account, attempted to explain the "red flags" cited in the *MarketWatch* report.

99.     On October 2, IGC countered *MarketWatch* report's of the dilapidated home/child care facility listed in the Company's SEC filings as its headquarters by filing a Form 424B5 with the SEC stating: "[o]perationally, our U.S. East Coast based staff works from our corporate office in Potomac, Maryland or nearby virtual offices. We also maintain offices in the State of Washington for our West Coast based staff."

100.   On October 6, IGC falsely refuted the alleged illegality of IGC's Nitro G announcement stating:



101.   Then on October 29, 2018, one day after the *MarketWatch* article was republished, the NYSE announced the following:

> NEW YORK, October 29, 2018 – NYSE American LLC ("NYSE American" or the "Exchange") announced today *that the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of India Globalization Capital, Inc.* (the "Company") – ticker symbol IGC – *from the Exchange.  Trading in the Company's common stock on the NYSE American will be suspended immediately*.

> NYSE Regulation commenced delisting proceedings against the Company pursuant to Section 1003(c) (i) of the NYSE American Company Guide (the "Company Guide") which states that where the issuer has substantially discontinued the business that it conducted at the time it was listed or admitted to trading, and has become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical, it shall not be considered an operating company for the purposes of continued trading and listing on the Exchange.

> *NYSE Regulation also considered Section 1003(f) (iii) because the Company or its management have engaged in operations which, in the opinion of the Exchange, are contrary to the public interest*.  Section 1009(a) (ii) of the Company Guide states that it is necessary and appropriate for the protection of investors to immediately suspend trading in the Company's common stock.

> The Company has a right to a review of staff's determination to delist the common stock by a committee of the Board of Directors of the Exchange.  *NYSE American will apply to the Securities and Exchange Commission to delist the Company's common stock upon completion of all applicable procedures*, including any appeal by the Company of the NYSE Regulation staff's decision.

(Emphasis added).

102.    Following this news, IGC common stock ceased trading on the NYSE American.

103.    On October 30, 2018, the Company issued a press release, announcing its intent to

re-list its securities on an alternative exchange.  The press release stated:

> BETHESDA, Md. – (BUSINESS WIRE) – India Globalization Capital, Inc.
> (NYSE American: IGC) announces today that it *is in the process of evaluating*
> *applications with alternative exchanges in the U.S. and Canada to list its common*
> *stock for public trading*.  IGC is working diligently to complete this process as
> quickly as possible and will provide additional updates in the very near term.
> Liquidity, elimination of unfair restrictions with respect to the commercialization
> of products, and customized support are expected to be key selection points.
>
> "We strongly disagree with the NYSE decision and will seek listing on an exchange
> that embraces our innovation.  We have been transparent in disclosing our active
> legacy operations and should not be penalized for moving forward to
> commercialize products in the emerging U.S. cannabis industry.  As a publicly
> traded company with cannabis ambitions, we are under great scrutiny and we intend
> to navigate the course for all our stakeholders and individuals seeking access to our
> innovative products including those under development," stated Ram Mukunda,
> CEO.

(Emphasis added).

104.    On November 9, 2018, the Company filed a Form 8-K with the SEC, which

announced:  "Following the suspension of trading in the Company's common stock on the NYSE

AMERICAN Exchange, the Company's shares will trade on the OTC Markets – OTC Pink Tier

while the Company follows the procedures to appeal the Exchange's decision."

105.    On this news, the price of the Company stock dropped $0.09 per share, or 8.3%

from the closing price on November 13, 2018, to close at $0.99 per share on November 14, 2018.

106.    Before markets opened on November 27, 2018, *MarketWatch* published another

article on the Company entitled, "The collapse of this cannabis stock offers a valuable lesson to

every investor."  The article discussed a number of issues at the Company, including past and

present legal proceedings against an IGC staffer and a stock promoter associated with the

Company.  The article stated in relevant part:

[W]hile IGC says on its website that it is rigorously studying cannabis, the company has spent only $137,000 in fiscal 2018 on research and development, according to its annual report.  It has spent $274,000 in the first two quarters of fiscal 2019, according to another securities filing.  In comparison, the average sum for a Phase 2 clinical trial of a treatment for pain is $17 million, according to CenterPoint, which advises on clinical trials.

*　　　*　　　*

**[H]ealth experts have questioned whether a cannabis product can treat symptoms of Alzheimer's**.  The American Alzheimer's Association, viewed as an authority on the disease, declined to comment on IGC or Hyalolex.  But it says **there has been very little research on the efficacy of cannabis or any of its ingredients in treating the disease or its symptoms**.

*　　　*　　　*

Dr. Ranga Krishna, the IGC staffer named as co-inventor of a cannabis-based pain treatment in an IGC patent filing, pleaded guilty to felony tax fraud in 2012.  He was sentenced to five years of probation, fined $94,090 and ordered to pay another $47,040 in restitution.  A consent order in January 2017 from the West Virginia Board of Medicine shows that Dr. Krishna was reprimanded for failing to disclose the conviction when applying to have his license in that state renewed.  That board also fined him.

Krishna did not respond to requests for comment left at his office in Brooklyn.  IGC did not respond to questions about him and did not make him available.

*　　　*　　　*

Professional stock promoters have pushed IGC stock to retail investors, who own 85% of the publicly available shares, according to FactSet.  One such promoter is SeeThruEquity, which was sued on Nov. 8 by the SEC.  In the civil complaint filed in the Federal District Court in Manhattan, the SEC accused SeeThruEquity and its co-founders of defrauding investors by issuing "unbiased" research reports on certain publicly traded company [sic] – including IGC – that were actually paid for by the companies themselves.  SeeThruEquity did not respond to requests for comment.

*　　　*　　　*

**A search of the site, which is partly under construction, found no mention of Hyalolex**.  A page headed "Our Stores" has headings for Oslo, Stockholm, New York, and London, but the page for each of those locations actually shows a map of Central Park.  **Medicann's** site has no phone number and no email address.  Its **address is listed as Sesame Street**.

(Emphasis added).

107.    On this news, the price of the Company stock dropped $0.13 per share, or 23.2% from the closing price on November 26, 2018, to close at $0.43 per share on November 27, 2018. This represented a **96.7%** decline from the stock's closing price on October 2, 2018, the day *Citron Research* began tweeting about the Company.

108.    Approximately three months later, on February 21, 2019, IGC announced that its shares would be relisted on the NYSE American.

109.    On February 26, 2019, IGC issued a press release (which it filed with the SEC on Form 8-K) stating that on November 5, 2018, Treasure Network had cancelled the Nitro G distribution agreement initially announced in the September 25, 2018 press release. IGC claimed that it was evaluating its options with respect to the cancellation.

110.    On March 26, 2019, IGC issued a press release (which it filed with the SEC on Form 8-K) stating, in relevant part, that "the Company has elected to terminate its Strategic Distributor & Partnership Agreement with Treasure Network Sdn Bhd, related to the sugar-free energy drink, Nitro G, effective March 26, 2019."

## DAMAGES TO IGC

111.    As a result of the Individual Defendants' wrongful conduct, IGC disseminated false and misleading statements and omitted material information to make such statements false and misleading when made. The improper statements have devastated IGC's credibility. IGC has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

112.    Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected IGC, and defendants Mukunda and Grimaldi to being named as defendants in the Securities Class Action.

113.    Thus, as a result of the Individual Defendants' misconduct, IGC has sustained damages, including, but not limited to:  (1) costs and expenses incurred from having to defend and possibly settle the Securities Class Action; (2) costs and expenses incurred from the Company's stock being delisted on the NYSE American and then the Company's subsequent efforts to have the stock relisted; and (3) costs and expenses incurred from the Company having to respond to the articles from *MarketWatch* and *Citron.*

114.    Moreover, these actions have irreparably damaged IGC's corporate image and goodwill.  For at least the foreseeable future, IGC will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that IGC's ability to raise equity capital or debt on favorable terms in the future is now impaired

**PLAINTIFF MADE A PRE-SUIT DEMAND ON
THE COMPANY PURSUANT TO MARYLAND LAW**

115.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

116.    Plaintiff is an owner of IGC common stock and was an owner of IGC common stock at all times relevant hereto.

117.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights.

118.    On February 12, 2019, Plaintiff made a demand on the Board to commence an action against the Individual Defendants (the "Demand Letter" or "Demand").  A copy of the Demand Letter is attached hereto and made part hereof as Exhibit A.  The Demand Letter and the allegations therein are incorporated herein by reference.

119.    On May 2, 2019, counsel for Plaintiff received a letter from counsel for IGC which stated, "The Company has conducted a thorough investigation and assessment of the allegations and legal claims raised in the Derivative Demand.  [A]fter deliberate consideration, the Board of Directors of the Company has determined that to proceed with the litigation described in your letter is not in the best interests of the Company or its shareholders.  Accordingly, the Company rejects your derivative demand."   A copy of the May 2, 2019 letter (the "Demand Refusal Letter) is attached hereto and made part hereof as Exhibit B.

120.    The refusal was improper as the Company did not act reasonably or in good faith.  First, the Demand Refusal Letter concedes that the Board ***failed*** to appoint any type of special litigation committee or any special committee to reasonably conduct an investigation of the allegations of the Demand Letter in good faith.

121.    Rather, it appears that the Board, who is itself inherently conflicted, did not delegate its decision making authority to a committee as required but performed its own investigation into the Demand Letter.  Thus, it comes as no surprise that the Demand was refused.  The failure to appoint a committee of independent and disinterested directors to perform the investigation is a fatal flaw, which cannot be rectified, and therefore the decision to refuse the Demand is not protected by the business judgment rule.

122.    Second, there is no mention of outside counsel being hired to assist with the investigation of the Demand Letter, affirming that the Refusal was not made in good faith.

123.    Third, the Demand Refusal Letter is void of any details regarding the investigation conducted by the Company such as any documents reviewed or interviews being performed.  The only take away from this is that the investigation was not reasonable nor was the Board's decision informed and made in good faith when it improperly refused the Demand.

124.    Finally, the Demand Refusal Letter makes no mention of a written report in connection with the Board's purported investigation of the Demand or the Board's decision to refuse the Demand.  In failing to produce a report, the Company neglected to keep a proper record of its investigation to allow Plaintiff and the Court to assess the reasonableness of its methodology in investigating the Demand.  That the Company failed to issue any report is an incurable mistake to the refusal of the Demand because there is no adequate record of the investigation and recommendation of the Board and no evidentiary record upon which to determine whether the Board in good faith refused the Demand.

125.    In sum, the Board has failed to act independently and in good faith.  Accordingly, the Board's refusal of the Demand falls outside the protection of the business judgment rule and this action should be allowed to proceed.

## COUNT I

### Breach Of Fiduciary Duty
### (Against the Individual Defendants)

126.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

127.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligations of good faith, fair dealing, loyalty, and due care.

128.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by knowingly causing and/or recklessly allowing the Company to make false and misleading statements and/or fail to disclose that:  (i) India Globalization substantially discontinued the business that it conducted at the time it began trading on the NYSE;

(ii) the Company had become engaged in ventures or promotions which have not developed to a commercial stage; (iii) cannabis-based products, including CBD-based beverages, are illegal in Malaysia; (iv) neither IGC nor Treasure Network was a licensed manufacturer of cannabis-based products in Malaysia; (v) CBD-infused Nitro G was not an approved and registered product under Malaysian law; (vi) Treasure Network, founded in 2017, was not "experienced"; (vii) Treasure Network was a distributor, not a manufacturer; (viii) at all relevant times, the Individual Defendants had the ability to exercise substantial control over Treasure Network; (ix) consequently, the Company was not an operating company for the purposes of continued trading and listing on the NYSE American; and (x) as a result, India Globalization's public statements were materially false and misleading at all relevant times.

129.    Moreover, the Individual Defendants willfully ignored the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

130.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, IGC has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

131.    Plaintiff, on behalf of IGC, has no adequate remedy at law.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B.      Finding the Individual Defendants liable for breaching their fiduciary duties owed to the Company;

C.     Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.


Dated: June 4, 2019                              Respectfully submitted,

**ADELBERG, RUDOW, DORF &**
   **HENDLER, LLC**

By: */s/ Andrew Radding*
Andrew Radding (#00195)
7 St. Paul Street, Suite 600
Baltimore, Maryland  21202
Telephone:     (410) 539-5195
Facsimile:     (410) 539-5834
Email:         ARadding@adelberg.com

*Liaison Counsel for Plaintiff*

**BRAGAR EAGEL & SQUIRE, P.C.**
Marion C. Passmore
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, New York  10022
Telephone:     (212) 308-5858
Facsimile:     (212) 214-0506
Email:         passmore@bespc.com
               fortunato@bespc.com

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
101 Lindenwood Drive, Suite 225
Malvern, Pennsylvania 19355
Telephone:     (484) 875-3116
Facsimile:     (914) 752-3041
Email:         mhynes@hh-lawfirm.com

*Counsel for Plaintiff*
4848-2804-4952, v. 1